IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 81044-8-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| WILLIAM HOWARD THOMPSON, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — William H. Thompson challenges his convictions for one count of rape of a child in the second degree and three counts of incest in the first degree via a direct appeal and two pro se post-judgment motions. The motions were transferred to this court as personal restraint petitions (PRPs) and subsequently consolidated with the appeal. In his direct appeal, Thompson claims instructional error caused double jeopardy violations and that his community custody conditions are unconstitutional. In his PRPs, Thompson argues the trial court sentenced him on an incorrectly calculated offender score, improperly relied on aggravating factors to enhance his sentence and erroneously admitted evidence of a recorded conversation. We accept the State's concession that the community custody condition prohibiting contact with the victim's family improperly restricted Thompson's contact with his wife and stepchildren, but find no merit to the remaining claims. Accordingly, we affirm the convictions and remand for the

trial court to modify the community custody condition regarding contact with certain family members.

FACTS

M.T. was born in February 1998 and is the daughter of William Thompson. M.T. began living with Thompson when she was five or six years old. At that time, Thompson and M.T.'s mother were divorced and Thompson had married Elizabeth[1] Thompson, who has three children from previous relationships. M.T. lived with Thompson and Elizabeth's family until shortly after she turned 18, when she moved out to live with her mother.

A few months after M.T. moved out, her grandmother died and she sought support from a school counselor she trusted. She told the counselor that she was struggling to focus, that she was really upset about her grandma's death and that it brought back the nightmares. When the counselor asked, "What nightmares?" she said "the nightmares of when my father used to rape me." The counselor then told her he was required by law to report this to the principal. The school called the police.

Two detectives interviewed M.T. and she described what happened to her. To corroborate her story, the detectives sought a wire intercept order to record conversations between M.T. and Thompson. M.T. then arranged to speak with Thompson while their conversation was recorded.[2]

---

[1] To avoid confusion we refer to Elizabeth Thompson by her first name. No disrespect is intended.

[2] The substance of that conversation is not part of the record on appeal. Neither party designated the exhibits containing the recording and transcript of the conversation.

The State charged Thompson with one count of second degree rape of a child and four counts of first degree incest. All of the charges included special allegations of domestic violence and aggravating circumstances of ongoing pattern of sexual abuse and the defendant holding a position of trust relative to the victim. Before trial, Thompson moved to suppress evidence of the recorded conversation with M.T. The trial court denied the motion.

At trial, M.T testified that before her 13th birthday Thompson raped her for the first time. No one was home at the time. M.T. was upstairs watching television when Thompson called her down to his room and said he was going to "do some things to [her]" and that she could not tell anyone. He then proceeded to fondle her breasts, digitally penetrate her and vaginally rape her. Afterward he gave her a towel to clean up and told her to go to the bathroom.

M.T. testified to another incident where Thompson raped her in the shower. She also testified in detail to two other separate incidents where Thompson made her have oral sex with him. M.T. further testified that these were not the only incidents. She said sometimes it would happen once a week, sometimes nothing would happen for a couple months and then it would start again, and sometimes it would happen a couple times a week.

The jury was instructed that, on count 1, second degree rape of a child, the State must prove beyond a reasonable doubt "[t]hat on or between February 1, 2011 and February 6, 2012, the defendant had sexual intercourse with [M.T.]." The jury was further instructed:

In alleging that the defendant committed Rape of a Child in the

3

Second Degree as charged in Count I, the State relies upon evidence regarding a single act constituting the alleged crime. To convict the defendant, you must unanimously agree that this specific act was proved.

On count 2, first degree incest, the jury was instructed the State must prove beyond a reasonable doubt "[t]hat on or between February 1, 2011 and February 7, 2012, the defendant engaged in sexual intercourse with [M.T.]" For each of the three remaining counts of first degree incest, the "to convict" instructions were identical, instructing the jury that the State must prove beyond a reasonable doubt "[t]hat on or between February 1, 2011 and February 7, 2016, the defendant engaged in sexual intercourse with [M.T.]." The jury was further instructed that for each of the four counts of first degree incest, "the State relies upon evidence regarding a single act constituting the allege crime. To convict the defendant, you must unanimously agree that this specific act was proved."

The jury found Thompson guilty as charged. The trial court sentenced him to 280 months confinement, the high end of the standard range. The trial court also imposed community custody conditions prohibiting him from contacting M.T. or her family and prohibiting him from possessing or accessing "sexually explicit material" and "sexually exploitive materials." Thompson appeals.

Thompson also filed a pro se CrR 7.8 motion in the trial court that was transferred to this court as a personal restraint petition. He later filed a pro se habeas corpus petition in the Washington Supreme Court that was transferred to this court as a personal restraint petition. Both personal restraint petitions have been consolidated with this appeal.

4

ANALYSIS

I.    Direct Appeal

On direct appeal, Thompson claims (1) the jury instructions violated his right to be free from double jeopardy, (2) the community custody condition prohibiting contact with his wife and adult children infringes on his fundamental rights to marriage and companionship with his children, and (3) the community custody conditions prohibiting his access to and possessive of sexually exploitive and sexually explicit materials are unconstitutionally vague.

A.    Double Jeopardy

Thompson claims that the jury instructions did not adequately protect him from exposure to double jeopardy on the counts of first degree incest because they did not inform the jury that each count of incest must be supported by separate and distinct acts. Thus, he contends, three counts must be vacated.

The constitutional guaranty against double jeopardy protects a defendant against multiple punishments for the same offense. State v. Mutch, 171 Wn.2d 646, 661, 254 P.3d 803 (2011). A double jeopardy claim is of constitutional proportions and may be raised for the first time on appeal. Id. We review double jeopardy claims de novo. Id.

In cases where, as here, multiple identical counts are charged during the same time period, instructions that do not inform the jury that each crime requires proof of a separate and distinct act create the potential for double jeopardy. Id. at 663. To determine whether such flawed instructions result in a double jeopardy violation, we may look to the entire trial record, including the evidence, arguments

5

and instructions. Id. at 664. "[I]f it is not clear that it was 'manifestly apparent to the jury that the State [was] not seeking to impose multiple punishments for the same offense' and that each count was based on a separate act, there is a double jeopardy violation." Id. (quoting State v. Berg, 147 Wn. App. 923, 931, 198 P.3d 529 (2008) (emphasis in original).

Here, the jury was not instructed that each count required proof of a separate and distinct act. The instructions simply indicated that the State was relying on evidence of a single act constituting the alleged crime, not a separate and distinct act for each count. Accordingly, we review the trial record to determine whether it was manifestly apparent to the jury that each count was based on a separate act. Where the testimony, arguments, and jury instructions make manifestly apparent that the State was not seeking to impose multiple punishments for the same offense, there is no double jeopardy violation. State v. Land, 172 Wn. App. 593, 602-3, 295 P.3d 782 (2013).

The evidence at trial established four separate acts of first degree incest. M.T. testified to two acts of intercourse during the first time it happened, before her 13th birthday. As the jury was instructed, only one of these acts supported the second degree rape of a child charge. Therefore, the other act was a separate act to support the one incest count alleged to have occurred between February 1, 2011 and February 7, 2012. M.T. also testified to three additional separate acts of intercourse: vaginal intercourse in the shower and two separate incidents of oral sex. In closing argument, the prosecutor clarified that the State was relying on each of these acts to prove the charged offenses:

We've charged the defendant with a large time—basically a large time gap. Five years. The time frame that [M.T.] says she was raped. But during those time frames, we've charged him with five specific counts. And I'll go over them right now, so that when you're deliberating you don't forget which ones are which.

The first count, Rape of a Child in the Second Degree, and the second count, Incest in the First Degree, those two counts go together. Those counts are for the first time that [M.T.] was raped when she was 12.

The third count, Incest in the First Degree. That count is for the time that he raped her in the shower.

The fourth count of Incest in the First Degree is for the time that she was down on all fours forced to give [Thomas] oral sex.

And the next count of Incest in the First Degree is for the time that she was forced to give him oral sex for the first time. When he described to her what 69 was for the first time. And she ended up throwing up after he shoved his penis in her mouth.

So to recap: Count I and Count II are the taking the virginity instance; Count III is for the shower; Count IV is for when she was down on all fours in her bedroom; And Count V is for the first time that he made her have oral sex.

The evidence, argument and instructions create clear distinctions between the three identically charged counts of first degree incest. Further, it is clear that it was manifestly apparent to the jury that each count was based on a separate act and the State was not seeking multiple punishments for the same offense. Accordingly, the lack of an instruction informing the jury that each count had to be based on a separate and distinct act did not violate Thompson's right to be free of double jeopardy. Mutch, 171 Wn.2d at 663-65; Land, 172 Wn. App. at 602.

B.     Community Custody Conditions

Generally, we review sentencing conditions for abuse of discretion. In re Pers. Restraint of Rainey, 168 Wn.2d 367, 374, 229 P.3d 686 (2010). We will reverse a community custody condition if it is "manifestly unreasonable." State v. Valencia, 169 Wn.2d 782, 791, 239 P.3d 1059 (2010). Imposing an

unconstitutional condition is manifestly unreasonable. Id. at 791.

"The rights to marriage and to the care, custody, and companionship of one's children are fundamental constitutional rights, and state interference with those rights is subject to strict scrutiny." State v. Warren, 165 Wn.2d 17, 34, 195 P.3d 940 (2008). "'[Sentencing] [c]onditions that interfere with fundamental rights' must be 'sensitively imposed' so that they are 'reasonably necessary to accomplish the essential needs of the State and public order.'" Rainey, 168 Wn.2d at 377 (quoting Warren, 165 Wn.2d at 32). Crime-related prohibitions affecting fundamental rights must also be narrowly drawn. Warren, 165 Wn.2d at 34-35. An order prohibiting a defendant's contact with a spouse or children survives strict scrutiny only if it is reasonably necessary to achieve a compelling state interest. Id. at 34; Rainey, 168 Wn.2d at 377.

Thompson challenges the community custody provision prohibiting "contact with victim(s) or his or her family," as impermissibly interfering with his fundamental rights to marriage and the companionship of his children. He contends the State has not shown that it has a compelling interest in prohibiting him from contacting his wife and stepchildren, who are also a part of M.T.'s family. The State responds that the sentencing conditions are not reviewable because Thompson failed to object at sentencing. But the State concedes that there is no compelling interest in prohibiting Thompson's contact with his wife and stepchildren and that "the offending provision must be stricken."

We accept the State's concession but disagree with the State that the sentencing conditions are not reviewable. As the Washington Supreme Court has

recognized, "'established case law holds that illegal or erroneous sentences may be challenged for the first time on appeal.'" State v. Bahl, 164 Wn.2d 739, 744, 193 P.3d 678 (2008) (quoting State v. Ford, 137 Wn.2d 472, 477, 973 P.2d 452 (1999)). Accordingly, we remand for the trial court to modify the no contact provision to exclude Thompson's wife and his stepchildren.

Thompson also challenges the community custody conditions prohibiting him from possessing or accessing "sexually explicit material" and "sexually exploitive materials" as unconstitutionally vague. Specifically, he challenges the following "sex-crime related" community custody conditions:

> The Defendant Shall-
>
> . . . .
>
> Possess/access no sexually exploitive materials (as defined by Defendant's treating therapist or CCO).
>
> . . . .
>
> Possess/access no sexually explicit materials and/or information pertaining to minors via computer (i.e. internet).

The federal and state constitutions require that citizens be afforded fair warning of proscribed conduct. State v. Nguyen, 191 Wn.2d 671, 678, 425 P.3d 847 (2018) (citing U.S. CONST., amend. XIV; WASH. CONST. art. I, § 3). "A community custody condition 'is not unconstitutionally vague merely because a person cannot predict with complete certainty the exact point at which his actions would be classified as prohibited conduct.'" Nguyen, 191 Wn.2d at 679 (quoting City of Seattle v. Eze, 111 Wn.2d 22, 27, 759 P.2d 366 (1988)). But a community custody condition is unconstitutionally vague if it (1) does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribe and (2) does not provide ascertainable standards of guilt to

protect against arbitrary enforcement. Nguyen, 191 Wn.2d at 678-79. The requirement of sufficient definiteness "does not demand 'impossible standards of specificity or absolute agreement,'" and permits some amount of imprecision. State v. Coria, 120 Wn.2d 156, 163, 839 P.2d 890 (1992) (citing City of Spokane v. Douglas, 115 Wn.2d 171, 179, 795 P.2d 693 (1990)). "[A] stricter standard of definiteness applies if material protected by the First Amendment falls within the prohibition." Bahl, 164 Wn.2d at 753.

In State v. Nguyen, the court held that a community custody condition prohibiting a defendant from possessing or viewing "sexually explicit material" was not unconstitutionally vague, recognizing that "sexually explicit material" is defined in RCW 9.68.130(2). 191 Wn.2d at 680. That statute provides:

> "Sexually explicit material" . . . means any pictorial material displaying direct physical stimulation of unclothed genitals, masturbation, sodomy (i.e. bestiality or oral or anal intercourse), flagellation or torture in the context of a sexual relationship, or emphasizing the depiction of adult human genitals: PROVIDED HOWEVER, That works of art or of anthropological significance shall not be deemed to be within the foregoing definition.

RCW 9.68.130(2). As the court explained,

> Despite Nguyen's concerns that "[c]ountless works of art, literature, film, and music explicitly describe, depict, and relate sex and sexuality," persons of ordinary intelligence can discern "sexually explicit material" from works of art and anthropological significance.

191 Wn.2d at 680-81.

We likewise reject similar arguments made by Thompson. While Thompson points out that unlike here, the community custody condition in Nguyen referred to statutory definitions, the court did not require their inclusion in the condition to withstand a vagueness challenge. Rather, the court noted its recognition in State

v. Bahl that the statutory definition in RCW 9.68.130(2) "bolsters the conclusion that 'sexually explicit material' is not an unconstitutionally vague term." Id. at 680; see Bahl, 164 Wn.2d at 760. The condition at issue in Bahl did not contain a statutory reference. 164 Wn.2d at 743, 758.

Thompson's reliance on State v. Padilla, 190 Wn.2d 672, 416 P.3d 712 (2018), is misplaced. While he contends that its "reasoning controls here," Padilla held that a condition prohibiting "pornographic material" was unconstitutionally vague despite the inclusion of a definition, which the court found was itself vague and overbroad. Id. 674-75. Such a condition is not at issue here.

Thompson further contends the prohibition involving "sexually exploitative materials" presents problems similar to those in Padilla because it is not statutorily defined and allowing the CCO or therapist to define the prohibited materials compounds the problem as in Bahl. The State argues that the statutory definitions of sexual exploitation of minor and sexually explicit conduct, when read together, do not require a person of ordinary intelligence to guess at its meaning, citing an unpublished decision, State v. Perkins,[3] which addresses a similar vagueness challenge to an identical community custody condition.

As our courts have recognized, because of the inherent vagueness of language, one may need to resort to other statutes to clarify the meaning of a term. See Bahl, 164 Wn.2d at 756. "Such sources are considered 'presumptively available to all citizens.'" Id. at 756 (quoting State v. Watson, 160 Wn.2d 1, 8, 154 P.3d 909 (2007)). RCW 9.68A.040 provides that a person commits the crime of

---

[3] No. 42793-1-II, slip op. (Wash Ct. App. Dec 20, 2013) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2042793-1-II%20%20Unpublished%20Opinion.pdf.

sexual exploitation of a minor if the person:

> (a) Compels a minor by threat or force to engage in sexually explicit conduct, knowing that such conduct will be photographed or part of a live performance;
> (b) Aids, invites, employs, authorizes, or causes a minor to engage in sexually explicit conduct, knowing that such conduct will be photographed or part of a live performance; or
> (c) Being a parent, legal guardian, or person having custody or control of a minor, permits the minor to engage in sexually explicit conduct, knowing that the conduct will be photographed or part of a live performance.

RCW 9.68A.011(4) defines "sexually explicit conduct" as actual or simulated:

> (a) Sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex or between humans and animals;
> (b) Penetration of the vagina or rectum by any object;
> (c) Masturbation;
> (d) Sadomasochistic abuse;
> (e) Defecation or urination for the purpose of sexual stimulation of the viewer;
> (f) Depiction of the genitals or unclothed pubic or rectal areas of any minor, or the unclothed breast of a female minor, for the purpose of sexual stimulation of the viewer. For the purposes of this subsection (4)(f), it is not necessary that the minor know that he or she is participating in the described conduct, or any aspect of it; and
> (g) Touching of a person's clothed or unclothed genitals, pubic area, buttocks, or breast area for the purpose of sexual stimulation of the viewer.

In Perkins, the court considered these statutes in response to a vagueness challenge to the same community custody condition at issue here and concluded:

> When viewed together, these statutes do not require persons of ordinary intelligence to guess at what is meant by the condition prohibiting access to or possession of "sexually exploitative materials." It would be impossible to list every type of prohibited conduct; "[s]entencing courts must inevitably use categorical terms to frame the contours of supervised release conditions." While there may be areas of disagreement concerning the materials that fall within this condition, and while Perkins's therapist and CCO have some control over its scope, we hold that the reference to "sexually

exploitative materials" is not so subjective as to be constitutionally suspect.

Slip op. at 9 (internal citations omitted). We adopt that reasoning here. Thompson's reliance on Bahl is misplaced. There, the court noted that the CCO's discretion made the vagueness problem "more apparent" in the condition prohibiting access to or possession of pornography, which did not provide adequate notice of the meaning of "pornography." 164 Wn.2d at 758. That condition is not at issue here.

II.     Personal Restraint Petition

Thompson raises additional issues in personal restraint petitions consolidated with this appeal. Thompson first filed a CrR 7.8 motion that was transferred to this court as a PRP. He then filed a "habeas corpus" petition in the Washington Supreme Court that was also transferred to this court as a PRP. Both petitions were consolidated with this appeal and, as the State concedes, both are timely. Br. of Respondent at 6 (response to second PRP); Br. of Respondent at 24 (response to direct appeal, first PRP). Accordingly, we treat the second petition as an amendment to the first petition. See State v. Fort, 190 Wn. App. 202, 242-43, 360 P.3d 820 (2015).

A petitioner may request relief through a PRP when the petitioner is under an unlawful restraint. RAP 16.4(a)-(c). A petitioner who collaterally attacks a conviction must satisfy a higher burden than an appellant on direct review. In re Pers. Restraint of Stockwell, 179 Wn.2d 588, 596-97, 316 P.3d 1007 (2014). "A personal restraint petitioner must prove either a[ ](1) constitutional error that results

in actual and substantial prejudice or (2) nonconstitutional error that 'constitutes a fundamental defect which inherently results in a complete miscarriage of justice.'" In re Pers. Restraint of Monschke, 160 Wn. App. 479, 488, 251 P.3d 884 (2010).

Thompson challenges his sentence, claiming the trial court miscalculated his offender score, made improper findings of aggravating factors and special allegations, and subjected him to double jeopardy by sentencing him on four counts that were based on "single conduct." Thompson also challenges the trial court's admission of evidence of his recorded conversation with M.T.

Thompson demonstrates neither error nor prejudice, much less a fundamental defect resulting in a complete miscarriage of justice. The offender score was properly calculated and included the current offenses for which Thompson does not account. See RCW 9.94A.589(1)(a). Thompson's challenges to the aggravating circumstances found by special verdict are without basis. He claims the court improperly relied on these aggravating circumstances to enhance his sentence, citing the standards for imposing an exceptional sentence outside the standard range, but the court imposed a sentence within the standard range.

Thompson's double jeopardy claim is the same claim raised by counsel in the direct appeal and as discussed above, is without merit. A petitioner may not renew issues that were considered and rejected on direct appeal unless the interests of justice require relitigation of those issues. In re Pers. Restraint of Lord, 123 Wn.2d 296, 303, 868 P.2d 835 (1994); see also In re Pers. Restraint of Pirtle, 136 Wn.2d 467, 491, 965 P.2d 593 (1998) ("A personal restraint petition is not meant to be a forum for relitigation of issues already considered on direct appeal.").

14

Finally, Thompson fails to show that the trial court erred by admitting evidence of the recorded conversation. As Thompson correctly states, RCW 9.73.030 prohibits the State from intercepting or recording a private conversation without prior consent of all parties to the conversation and any information obtained in violation of the statute is inadmissible in a civil or criminal proceeding. RCW 9.73.050. But RCW 9.73.090(2) provides an exception to RCW 9.73.030 and permits a law enforcement officer to intercept, record or disclose a conversation where one of the parties has given consent prior to the interception, recording or disclosure, provided the officer obtains prior written authorization from a judge or magistrate. The judicial officer "shall approve the interception, recording, or disclosure of communications with a nonconsenting party for a reasonable and specified period of time if there is probable cause to believe that the nonconsenting party has committed, is engaged in, or is about to commit a felony." RCW 9.73.090(2). To obtain judicial authorization, the law enforcement officer must submit an application to the judge or magistrate, the contents of which are specified in RCW 9.73.130. Communications or conversations authorized to be intercepted, recorded or disclosed under RCW 9.73.090(2) "shall not be inadmissible under RCW 9.73.050." RCW 9.73.090(3).

Thompson claims the trial court erred by admitting evidence of the recorded conversation because he did not consent to the recording and he did not admit to committing a crime during the recorded conversation. As discussed above, under RCW 9.73.090(2), a law enforcement officer may lawfully record a conversation so long as one of the parties to the conversation gives prior consent and the officer

obtains prior written judicial authorization. Here, M.T. gave consent. And as the trial court found, the detective's application for authorization to intercept and record the conversation complied with the requirements of RCW 9.73.130 and "clearly contained a statement of facts justifying the intercept and recording, including a statement of probable cause, detailed information concerning the offense and the need to intercept and record." Thompson does not challenge these findings. Moreover, Thompson provides no authority requiring that a defendant admit to committing a crime in the recorded conversation in order for it to be admissible. Rather, the application for authorization to intercept or record the conversation must include "[t]he details as to the particular offense that has been, is being, or is about to be committed." RCW 9.73.130(3)(b). Thompson's argument appears to go to the weight, not the admissibility, of the evidence, which is a determination for the trier of fact.

We affirm the convictions, remand for the trial court to modify the community custody condition prohibiting contact with the victim's family, and deny the personal restraint petition.

WE CONCUR:

Andrus, A.C.J.

16